## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| JACK PITTROF, Derivatively on Behalf of DOW, INC., | Case No. |
| Plaintiff, | |
| v. | **DEMAND FOR JURY TRIAL** |
| JIM FITTERLING, JEFFREY A. TATE, KAREN S. CARTER, SAMUEL R. ALLEN, GAURDIE E. BANISTER, JR., WESLEY G. BUSH, RICHARD K. DAVIS, JERRI DEVARD, DEBRA L. DIAL, JEFF M. FETTIG, JACQUELINE C. HINMAN, REBECCA B. LIEBERT, LUIS ALBERTO MORENO, JILL S. WYANT, and DANIEL W. YOHANNES, | |
| Defendants, | |
| and | |
| DOW, INC., | |
| Nominal Defendant. | |

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff Jack Pittrof ("Plaintiff"), by and through his undersigned attorneys,

brings this verified stockholder derivative action on behalf of nominal defendant

Dow, Inc. ("Dow" or the "Company"), against certain of the Company's executive

officers and its Board of Directors (the "Board") for breaches of fiduciary duties and

violations of federal law by the Individual Defendants (defined below). Plaintiff's allegations are based on personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based on, *inter alia*: the investigation conducted by his counsel, including review of publicly available information regarding the Company; the allegations of a class action complaint filed in the securities class action captioned *Sarti v. Dow Inc. et al.*, Case No. 1:25-cv-12744-TLL-PTM (E.D. Mich. Aug. 29, 2025) (the "Securities Class Action"); conference call transcripts and announcements; filings with the United States Securities and Exchange Commission (the "SEC"); press releases disseminated by Dow; legal filings; news reports; and securities analysts' reports about the Company.

## **NATURE OF THE ACTION**

1.     This is a shareholder derivative action brought in the right, and for the benefit, of Dow against the Individual Defendants, certain of Dow's officers and directors, seeking to remedy their violations of federal law and breaches of fiduciary duty that have occurred from at least January 30, 2025 to July 23, 2025 (the "Relevant Period").

2.     Dow specializes in the production of chemicals, materials, and plastics for use in a variety of industries, including packaging, electronics, automotive, construction, and consumer goods.

3.     The Company's operations are divided into three reportable business

segments: (i) Packaging & Specialty Plastics; (ii) Industrial Intermediates & Infrastructure; and (iii) Performance Materials & Coatings.

4.    Before and during the Relevant Period, Dow management consistently highlighted the Company's "industry-leading dividend" to attract investors. However, during the Relevant Period, the Company struggled to navigate adverse industry-wide conditions, including a downturn in the materials science industry and uncertainty related to tariffs. Despite these difficult macroeconomic conditions, the Company assured investors that it would be able to deliver lucrative dividends due to its purported "differentiated portfolio," "cost-advantaged footprint," and "industry-leading flexibility to navigate global trade dynamics."

5.    On June 23, 2025, the truth began to emerge, when BMO Capital ("BMO") issued a report on the Company, reducing its price target for Dow stock from $29.00 per share to $22.00 per share, citing "[t]he significant weakness across [Dow's] end-markets resulting in soft pricing and lower vol[ume]s/op[erating] rates."

6.    On this news, the price of Dow stock declined 3.21%, from a close of $27.76 per share on June 20, 2025 to a close of $26.87 per share on June 23, 2025, the following trading day.

7.    Then, on July 24, 2025, Dow reported disappointing second quarter 2025 financial results, specifically with respect to net sales and non-GAAP loss per

share, attributable to "the lower-for-longer earnings environment that our industry is facing, amplified by recent trade and tariff uncertainties." The same day, the Company announced that it was reducing its dividend from $0.70 per share to $0.35 per share, citing a need for "financial flexibility amidst a persistently challenging macroeconomic environment."

8.     On this news, the price of Dow stock declined 17.45%, from a close of $30.37 per share on July 23, 2025 to a close of $25.07 per share on July 24, 2025.

9.     As a direct and proximate result of the misconduct detailed herein, the Company has incurred significant financial losses, including the cost of defending itself and, potentially, incurring class-wide damages in the Securities Class Action, as well as additional losses in market capitalization, reputational harm, and the loss of goodwill.

10.     Moreover, in light of the breaches of fiduciary duty by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the Securities Class Action, and that the Individual Defendants are beholden to each other based on their longstanding business and personal relationships, the Individual Defendants do not possess the requisite level of disinterestedness and independence to consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company.

Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. §§ 78n(a) and Rule 14a-9 (17 C.F.R.§240.14a-9) and Sections 10(b) and 21D of the Exchange Act and Rule 10b-5 (17 C.F.R.§240.10b-5) promulgated thereunder by the SEC.

12.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

13.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

14.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

15.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

16.     This Court has personal jurisdiction over each Defendant named herein

because each Defendant is either a corporation that conducts business in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

17.     Venue is proper in this district pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. §1391 because Defendants have conducted business in this District, the Company is headquartered in this District, and a substantial portion of the transactions and wrongs complained of herein occurred in this District. Further, the Securities Class Action is currently pending in this District.

## PARTIES

*Plaintiff*

18.     Plaintiff is, and has been at all relevant times, a shareholder of Dow.

*Nominal Defendant*

19.     Nominal Defendant Dow is incorporated under the laws of Delaware, with its principal executive offices located at 2211 H.H. Dow Way, Midland, Michigan 28674. Dow common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "DOW."

*Individual Defendants*

20.     Defendant Jim Fitterling ("Fitterling") has served as the Company's Chief Executive Officer ("CEO") and as a member of the Board since 2018 and as

Chairman of the Board since 2020. According to the Company's public filings, Defendant Fitterling received $18,835,465 in 2024 in compensation from the Company. As of February 7, 2025, Defendant Fitterling beneficially owned 1,792,508 shares of Dow common stock, worth roughly $69.2 million.[1] Defendant Fitterling is named as a defendant in the Securities Class Action.

21.     Defendant Samuel R. Allen ("Allen") has served as a member of the Board since 2019. According to the Company's public filings, Defendant Allen received $348,773 in 2024 in compensation from the Company. As of February 7, 2025, Defendant Allen beneficially owned 14,903 shares of Dow common stock, worth roughly $574,958.

22.     Defendant Gaurdie E. Banister, Jr. ("Banister") has served as a member of the Board since 2020. According to the Company's public filings, Defendant Banister received $328,773 in 2024 in compensation from the Company. As of February 7, 2025, Defendant Banister beneficially owned 19,468 shares of Dow common stock, worth roughly $751,075.

23.     Defendant Wesley G. Bush ("Bush") has served as a member of the Board since 2018 and served as a member of the Audit Committee during the Relevant Period. According to the Company's public filings, Defendant Bush

---

[1] Valuations of the Individual Defendants' personal holdings of Company stock are based on the $38.58 per share closing price of Dow stock on February 7, 2025.

received $328,773 in 2024 in compensation from the Company. As of February 7, 2025, Defendant Bush beneficially owned 40,302 shares of Dow common stock, worth roughly $1.6 million.

24.    Defendant Richard K. Davis ("Davis") has served as a member of the Board since 2015 and served as a member of the Audit Committee during the Relevant Period. According to the Company's public filings, Defendant Davis received $397,523 in 2024 in compensation from the Company. As of February 7, 2025, Defendant Davis beneficially owned 36,351 shares of Dow common stock, worth roughly $1.4 million.

25.    Defendant Jerri DeVard ("DeVard") has served as a member of the Board since 2022 and served as a member of the Audit Committee during the Relevant Period. According to the Company's public filings, Defendant DeVard received $328,773 in 2024 in compensation from the Company. As of February 7, 2025, Defendant DeVard beneficially owned 2,902 shares of Dow common stock, worth roughly $111,959.

26.    Defendant Debra L. Dial ("Dial") has served as a member of the Board since 2021 and served as a member of the Audit Committee during the Relevant Period. According to the Company's public filings, Defendant Dial received $328,773 in 2024 in compensation from the Company. As of February 7, 2025, Defendant Dial beneficially owned 8,468 shares of Dow common stock, worth

roughly $326,695.

27.     Defendant Jeff M. Fettig ("Fettig") has served as a member of the Board since 2003. According to the Company's public filings, Defendant Fettig received $352,523 in 2024 in compensation from the Company. As of February 7, 2025, Defendant Fettig beneficially owned 82,645 shares of Dow common stock, worth roughly $3.2 million.

28.     Defendant Jacqueline C. Hinman ("Hinman") has served as a member of the Board since 2018. According to the Company's public filings, Defendant Hinman received $348,773 in 2024 in compensation from the Company. As of February 7, 2025, Defendant Hinman beneficially owned 17,932 shares of Dow common stock, worth roughly $691,817.

29.     Defendant Rebecca B. Liebert ("Liebert") has served as a member of the Board since February 2025.

30.     Defendant Luis Alberto Moreno ("Moreno") has served as a member of the Board since 2021. According to the Company's public filings, Defendant Moreno received $328,773 in 2024 in compensation from the Company. As of February 7, 2025, Defendant Moreno beneficially owned 5,768 shares of Dow common stock, worth roughly $222,529.

31.     Defendant Jill S. Wyant ("Wyant") has served as a member of the Board since 2020. According to the Company's public filings, Defendant Wyant

received $328,773 in 2024 in compensation from the Company. As of February 7, 2025, Defendant Wyant beneficially owned 10,829 shares of Dow common stock, worth roughly $417,783.

32.    Defendant Daniel W. Yohannes ("Yohannes") has served as a member of the Board since 2018. According to the Company's public filings, Defendant Yohannes received $328,773 in 2024 in compensation from the Company. As of February 7, 2025, Defendant Yohannes beneficially owned 15,932 shares of Dow common stock, worth roughly $614,657.

***Officer Defendants***

33.    Defendant Jeffrey L. Tate ("Tate") has served as the Company's Chief Financial Officer ("CFO") since 2023. According to the Company's public filings, Defendant Tate received $5,528,030 in 2024 in compensation from the Company. Defendant Tate is named as a defendant in the Securities Class Action.

34.    Defendant Karen S. Carter ("Carter") has served as the Company's Chief Operating Officer ("COO") since 2024. Defendant Carter is named as a defendant in the Securities Class Action.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

35.    By reason of their positions as officers and/or directors of Dow, and because of their ability to control the business and corporate affairs of Dow, the Individual Defendants owed Dow and its shareholders fiduciary obligations of trust,

loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Dow in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Dow and its shareholders so as to benefit all shareholders equally.

36.    Each director and officer of the Company owes to Dow and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

37.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Dow, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

38.    To discharge their duties, the officers and directors of Dow were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

39.    Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations

as directors and/or officers of Dow, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

40.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty: to ensure that Dow implemented and properly monitored the Company's internal controls over financial reporting; to prevent the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations; and to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

41.     To discharge their duties, the officers and directors of Dow were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties,

the officers and directors of Dow were required to, among other things:

      a)    Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, the United States, and pursuant to Dow's own Code of Conduct and internal guidelines;

      b)    Conduct the affairs of the Company in an efficient, businesslike manner to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock.

      c)    Remain informed as to how Dow conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make a reasonable inquiry and to take steps to correct such conditions or practices;

      d)    Establish and maintain systematic, accurate records and reports of the business and internal affairs of Dow and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause an independent investigation to be made of, said reports and records;

      e)    Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Dow's operations would comply with all laws and Dow's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate.

f)      Exercise reasonable control and supervision over the Company's officers and employee's public statements and any other reports or information that the Company was required by law to disseminate.

g)      Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

h)      Examine and evaluate any reports of examinations, audits, or additional financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

42.      Each of the Individual Defendants further owed to Dow and the shareholders the duty of loyalty requiring that each favor Dow's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

43.      At all times relevant hereto, the Individual Defendants were the agents of each other and of Dow and were at all times acting within the course and scope of such agency.

44.      The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public

statements issued by Dow.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

45.     In committing the wrongful acts alleged herein, the Individual Defendants have engaged in, or aligned themselves with, a common course of conduct, acting in concert and conspiring with one another to further their misconduct. They caused the Company to conceal the true facts as outlined in this complaint. Additionally, the Individual Defendants aided, abetted, and/or assisted each other in breaching their respective duties.

46.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to enable and conceal the Individual Defendants' violations of the law, including breaches of fiduciary duty and unjust enrichment.

47.     The Individual Defendants carried out their conspiracy, common enterprise, and/or coordinated actions by causing the Company to deliberately, recklessly, or negligently conceal material facts, fail to correct those misrepresentations, and violate applicable laws.

48.     To advance this plan, conspiracy, and course of conduct, the Individual Defendants, both collectively and individually, carried out the actions described herein. As these actions were executed under the Board's authority, each of the Individual Defendants, being directors of Dow, was a direct, essential, and

significant participant in the conspiracy, joint enterprise, and/or coordinated conduct alleged in this complaint.

49.    Each of the Individual Defendants aided, abetted, and provided substantial assistance in the wrongdoings described herein. In providing such assistance, each Individual Defendant acted with actual or constructive knowledge of the primary misconduct, either directly participated in or significantly contributed to the commission of that wrongdoing, and was, or should have been, aware of their overall role in furthering the misconduct.

50.    At all relevant times, each of the Individual Defendants acted as an agent of the other Defendants and of Dow, and at all times operated within the course and scope of that agency.

## **DOW'S CODE OF CONDUCT**

51.    Dow's Code of Conduct begins with a message from Defendant Fitterling, which states, in pertinent part:

> For more than 125 years, Dow people have built an invaluable asset: our Company's reputation for operating with the highest ethical standards, honesty and fairness. As we work together to fulfill our ambition to be the world's most innovative, customer-centric, inclusive and sustainable materials science company, we recognize that our reputation for ethics and integrity will continue to be both a competitive advantage and foundational to our continued success.
>
> To preserve the trust of our stakeholders and uphold our Company's Values of Integrity, Respect for People and Protecting Our Planet, we must all work together to achieve the right results, the right way. No excuses. No shortcuts. The Dow Inc. Code of Conduct is a guide to the

16

behaviors and principles of conduct that we expect from each of our employees – no matter our roles or where we are located. I encourage you to carefully read the Code and refer to it for guidance.

We each have the duty to perform our jobs in an open, honest and ethical manner even when it is not to our advantage. Exercising good judgment also entails speaking up if you have concerns or suspect any activity that violates our Code of Conduct or the law.

52.     The Code of Conduct "applies to all directors, officers, and full- and part-time employees of Dow Inc., including all subsidiaries," and "anyone who violates the Code is subject to disciplinary measures in conformance with applicable laws, up to and including termination of employment."

53.     With respect to conflicts of interest, the Code of Conduct states, in pertinent part:

We are expected to avoid situations where personal interests conflict, or appear to conflict, with Dow's best interests. This includes any activity that interferes with our ability to perform our roles objectively or may cause others to doubt our fairness. We are all expected to comply with Company-required steps to mitigate or resolve conflicts of interest.

54.     With respect to the Company's "business and financial records," the Code of Conduct states, in pertinent part:

Business and financial records are essential to Dow's success. The integrity and accuracy of these records help internal decision-making and are the basis of our reporting to shareholders, investors, creditors, government agencies and other stakeholders. We must:

- Keep and present all Company records and reports in accordance with the law, our internal control policies, and generally accepted accounting principles. These records include accounting records

17

as well as any other electronic or written records, such as expense reports, time sheets, medical claim forms, personnel records and reviews, and the wide variety of analytical, engineering and technical reports generated by the Company.

- Establish and maintain a system of strong and effective internal controls.

- Ensure that all Company records accurately and fairly reflect the underlying transaction.

- Never falsify any document.

- Record all financial transactions in the proper account, department and accounting period.

- Ensure that all actions and commitments are in accordance with Dow's Authorization Policy and Delegation of Authority.

- Validate that all public communications, including reports to government authorities, are full, fair, accurate, timely and understandable.

55.    With respect to the Company's corporate assets, the Code of Conduct states, in pertinent part:

We all have an obligation to protect Dow resources and use them properly. Our resources are intended for business use. In certain situations, personal use of computers, telephones, mobile communications devices, internet access and email may be acceptable on a limited basis as long as we follow Company policies and do not generate additional costs. We are expected to:

- Use our Company resources legally and responsibly.

- Safeguard Dow resources from theft, waste, and unauthorized access and use.

18

56.     In a subsection titled "Competition," the Code of Conduct states that "[o]ur responsibility to conduct business ethically extends to our relationships with customers, shareholders, suppliers, competitors and regulators. This means competing within appropriate legal boundaries and on the basis of price, quality and service."

## DOW'S AUDIT COMMITTEE CHARTER

57.     Pursuant to Dow's Audit Committee Charter, the purpose of the Audit Committee is to assist the Board in fulfilling its oversight responsibilities with respect to:

- the quality, reliability and integrity of the financial statements of the Company;

- the quality, reliability and integrity of environmental, social and governance reporting by the Company;

- the adequacy of the Company's internal controls particularly with respect to the Company's compliance with legal and regulatory requirements and corporate policy;

- the Company's internal audit function;

- the nomination of the independent auditor and the independent auditor's qualifications, independence and performance; and

- the application of the Company's accounting principles.

58.     The Audit Committee Charter tasks the Audit Committee with the following responsibilities:

<u>Financial Reporting and Disclosure</u>

- Review with management and the independent registered public accounting firm of the Company's financial statements, disclosures and Management's Discussion and Analysis of Financial Condition and Results of Operations, and critical audit matters disclosed in the auditor's report to be included in the Company's Annual Report on Form 10-K and in its quarterly reports on Form 10-Q prior to filing such reports with the SEC. Such review shall include a discussion with the independent registered public accounting firm regarding those matters required to be discussed under generally accepted auditing standards and applicable regulations.

- Discuss with the independent registered public accounting firm, and resolve, any problems or difficulties encountered during the course of the audit, management's response and any significant disagreements with management.

- Review and discuss with management the type and presentation of information to be included in the Company's press releases announcing financial results and, if applicable, guidance on financial results (especially the use of "pro forma" or "adjusted" information not prepared in compliance with generally accepted accounting principles), and the Company shall provide to the Committee in advance each such press release or other communication in which the Company may provide guidance on financial results and other financial information so the Committee may review and discuss with management (though the Committee need not discuss in advance each such press release or each instance in which the Company may provide guidance on financial results).

- Review with management (including the corporate auditor) and the independent registered public accounting firm (1) major issues regarding accounting principles and financial statements presentations, including any significant changes in the Company's selection or application of accounting principles or accounting conventions; (2) any analyses prepared by management and/or the independent registered public

accounting firm setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative generally accepted accounting principles methods on the Company's financial statements; and (3) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company.

*    *    *

Internal Audit

- Approve the appointment, removal and annual compensation of the corporate auditor.

- Review the internal audit charter, annual plan and scope of work and significant internal control findings.

- In collaboration with management, review and appraise the audit efforts of the Company's internal audit function, including the responsibilities, budget and staffing of the internal audit function.

*    *    *

- Meet periodically with management to discuss current and, if any, proposed, guidelines and policies governing the processes used to assess, monitor and control the Company's major risk exposures, including climate-related or financial risk exposures, as well as, if any, actual major risk exposures.

- Meet periodically with the general counsel to review legal and regulatory matters, including (1) any matters that may have a material impact on the financial statements of the Company, and (2) any matters involving potential or ongoing material violations of law or breaches of fiduciary duty by the Company or any of its directors, officers, employees or agents or breach of fiduciary duty to the Company.

21

- Meet at least annually with senior management to review and approve the Company's global tax strategy and policy.

- Oversee the Company's cybersecurity and information security framework and risk management; meet at least annually with senior management to review and discuss the Company's cybersecurity program and information security policies and procedures including key risk areas and mitigation strategies; review periodic reports on any notable cyber threats or incidents.

- Review the effectiveness of the Company's systems, procedures and programs designed to promote and monitor compliance with applicable laws and regulations and receiving prompt reports from the general counsel, corporate auditor and/or the senior compliance person(s), as appropriate, on any compliance matter that could adversely impact the quality, reliability or integrity of the Company's external financial process or adequacy of the Company's internal controls.

- Oversee the Company's compliance programs, including code of business conduct and code of financial ethics, and, at least annually, meet to review the implementation and effectiveness of the Company's ethics and compliance programs with the Company's general counsel, who shall have the authority to communicate promptly and directly to the Committee about any matters involving criminal or potential criminal conduct.

- Review the Company's policies relating to the ethical handling of conflicts of interest and reviewing past or proposed transactions between the Company and members of management as well as policies and procedures with respect to officers' expense accounts and perquisites, including the use of corporate assets. The Committee shall consider the results of any review of these policies and procedures by the independent registered public accounting firm.

## SUBSTANTIVE ALLEGATIONS

*Background*

59.    Dow is a multinational corporation based in Michigan, specializing in the production of chemicals, materials, and plastics for use in a variety of industries, including packaging, electronics, automotive, construction, and consumer goods.

60.    The Company's operations are divided into three reportable business segments: (i) Packaging & Specialty Plastics; (ii) Industrial Intermediates & Infrastructure; and (iii) Performance Materials & Coatings.

61.    The Company has consistently highlighted its "industry-leading dividend" to attract investors. For instance, during earnings calls, Defendant Fitterling has represented that Dow's "dividend is a key element of our investment thesis," and that "north of 65% of our owners count on that dividend."

62.    During the Relevant Period, the Company struggled to navigate adverse industry-wide conditions, including a downturn in the materials science industry and uncertainty related to tariffs. Despite these difficult macroeconomic conditions, the Individual Defendants represented that the Company was well-positioned to deliver lucrative dividends due to its purported "differentiated portfolio," "cost-advantaged footprint," and "industry-leading flexibility to navigate global trade dynamics."

*Materially False and Misleading Statements*

63.    On January 30, 2025, the Company issued a press release, reporting its

fourth quarter 2024 financial results (the "4Q24 Press Release"). The 4Q24 Press

Release quoted Defendant Fitterling as stating, in pertinent part:

> *Despite persistently weak macroeconomic conditions, Team Dow delivered our fifth consecutive quarter of [Y/Y] volume growth, leveraging our cost-advantaged footprint to capture resilient demand for high-value applications*. In December, we signed a definitive agreement for the sale of a minority stake in select U.S. Gulf Coast infrastructure assets for expected cash proceeds of up to approximately $3 billion. The partnership represents a new business model *designed to drive operational efficiencies and growth with new customers, while providing near-term financial flexibility*. We also announced a strategic review of select European assets, and today we are announcing additional actions to deliver $1 billion of targeted cost reductions. *These collective actions represent a continuation of Dow's commitment to maintaining our strong financial foundation* and supplementing near-term cash flow.[2]

64.    With respect to the Company's 2025 fiscal outlook, the 4Q24 Press

Release quoted Defendant Fitterling as stating:

> *We remain confident that Dow will benefit from the completion of our near-term incremental growth projects and an enhanced focus on operational discipline in 2025. In addition, we are optimistic that we will see further demand growth in attractive end markets such as packaging, energy and electronics. . . . Our differentiated portfolio and strong balance sheet enable us to deliver on all our capital allocation priorities, including an industry-leading dividend*. Until we see more definitive indications of a true recovery taking hold – and in order to deliver improved margins – we are taking actions to reduce our costs by $1 billion as well as our 2025 CapEx [capital expenditure] plans by $300 - 500 million. We will complete these actions while staying the course on our long-term strategic priorities. Our proactive interventions are necessary for Dow to continue to successfully navigate this economic downcycle.

---

[2] Unless indicated otherwise, all emphasis is added.

65.    The same day, the Individual Defendants hosted an earnings call for the fourth quarter of 2024 (the "4Q24 Earnings Call"). During introductory remarks, Defendant Fitterling highlighted the Company's ability to "deliver . . . [Y/Y] volume growth despite continued weak macroeconomic conditions" and to "foster a sustainable future, achieve long-term profitable growth, and enhance shareholder returns." Defendant Fitterling additionally represented that Dow's "near-term growth investments" would "enable improved underlying earnings and margins across the cycle" and touted the Company's "differentiated portfolio and proactive actions to support our solid financial foundation," expressing "confiden[ce] in our ability to deliver on all of our capital allocation priorities, including our industry-leading dividend."

66.    Also during the 4Q24 Earnings Call, while cautioning that "[i]n China, manufacturing activity remains tepid and overall demand in Europe continues to be soft," Defendant Tate maintained that "in packaging, we continue to see demand growth, especially in North America with resilient domestic and export polyethylene demand throughout the year."

67.    With respect to the Company's Industrial Intermediates & Infrastructure business segment, Defendant Tate claimed that "planned maintenance activity scheduled at our ethylene oxide asset in . . . Texas . . . will enable the start-up of additional alkoxylation capacity in the US Gulf Coast," highlighting "[t]his

new capacity" as one of several "near-term growth investments" that "should support higher sales beginning in the second-quarter" of 2025.

68.    With respect to the Company's Performance Materials & Coating business segment, Defendant Tate claimed that "we expect the seasonal demand uptick in [the] first quarter [of 2025] to provide a tailwind of approximately $75 million" despite "soft[ness]" in "building and construction end-markets" and "high mortgage rates in the US and sector weakness in China."

69.    Also during the 4Q24 Earnings Call, in response to a question regarding the Company's expected earnings before interest, taxes, depreciation and amortization ("EBITDA") in the event that "demand is unfortunately similar in 2025 versus 2024," Defendant Fitterling stated, in pertinent part:

> On 2025 versus 2024, obviously, a big part of the $1 billion of cost actions we're taking are to underpin improved EBITDA in 2025. So *we've got volume growth and I mentioned the projects that we'll have starting out this year, which all of them will be able to be sold-out and be accretive from the point that they start-up. So you'll have that*. We're obviously not counting on a tremendous amount, *although we've shown five consecutive quarters of volume growth. So we're still going to keep taking advantage of our low-cost position and get our share*. But I think pricing power is the real question and that's the reason for the cost action is to underpin the improvement in EBITDA.
>
> I would say you also have to think about the markets and a lot will depend on demand in the markets. In PNSP [Packaging & Specialty Plastics], well, I'd say in the ethylene chain, in general, *PNSP and ethylene oxide derivatives have continued to be strong. You see that strength in Industrial Solutions. You see that strength*. Although we had some pricing slip in the fourth quarter. *Overall, we see that strength in the integrated margins of PNSP. So I think that will*

> *continue to be a positive sign*. I think we'll continue to take the actions
> that we need to take in Europe to tighten things up there.
>
> \*        \*        \*
>
> And then, of course, cash, we're going to manage very carefully, which
> is why you saw the CapEx reductions that we announced to try to stay
> in a better cash-flow position and *keeping our dividend strong is one
> of the number one priorities.*

70.    In response to an analyst question regarding "the risk and potential mitigation activities you could do around tariffs, specifically around Canada," Defendant Fitterling stated, in pertinent part:

> I think the most important thing is what we're doing right now, which
> is engage with the administration on providing data for ourselves and
> also for the industry to understand the situation. *And we're starting to
> see every day like more refinement on what's happening*. I think it's
> pretty clear in the near-term of the discussion is around getting control
> over immigration and the flow of fentanyl into United States.

71.    On February 4, 2025, the Company filed its 2024 annual report on Form 10-K with the SEC (the "2024 10-K"), which was signed by Defendants Fitterling, Tate, Allen, Banister, Bush, Davis, DeVard, Dial, Fettig, Hinman, Moreno, Wyant, and Yohannes. The 2024 10-K repeated substantially similar statements to those contained in the 4Q24 Press Release regarding the Company's 2025 outlook:

> The Company remains confident that *it will benefit from the
> completion of its near-term incremental growth projects and an
> enhanced focus on operational discipline in 2025*. In addition, the
> Company is optimistic that it will see *further demand growth in
> attractive end-markets* such as packaging, energy and electronics.
> *Dow's differentiated portfolio and strong balance sheet enables it to
> deliver on all of its capital allocation priorities, including an industry-*

***leading dividend.***

72.    With respect to the Company's Packaging & Specialty Plastics business

segment, the 2024 10-K stated:

> In Packaging & Specialty Plastics, ***supply improvements driven by new polyethylene capacity coming online during 2025, combined with improved reliability, will allow the Company to continue to drive volume growth and improve margins***. Local prices are expected to be impacted by market supply and demand dynamics as well as volatility in feedstocks due to sensitivity to external economic and geopolitical factors. ***The Company's feedstock flexibility and advantaged regional footprint will continue to position the segment well to navigate market dynamics throughout the year. In-region presence and superior derivative flexibility will allow the segment to continue to optimize price and volume mix***.

73.    Similarly, with respect to the Company's Industrial Intermediates & Infrastructure business segment, the 2024 10-K stated:

> In Industrial Intermediates & Infrastructure, ***improved demand is expected based on improving fiscal conditions*** resulting from interest rate cuts across several regions. ***The Company will benefit from the full-year impact of resumed production at the Louisiana Operations Glycol-2 unit in Plaquemine, Louisiana***, which successfully restarted in June 2024. ***Recent and in-flight growth investments in specialty amines and alkoxylation capacity are expected to support long-term, above GDP volume growth in key markets*** including energy transition, pharmaceuticals and consumer health, and sustainable surfactants.

74.    With respect to the Company's Performance Materials & Coatings business segment, the 2024 10-K stated:

> In Performance Materials & Coatings, the Company will continue to prioritize key end-markets in performance silicones in which its ***innovation and footprint can drive value and volume growth above GDP. Pricing for specialty products is expected to remain relatively***

*stable, with anticipated modest but steady economic expansion.*
*Volume growth is expected in feedstocks and intermediates on*
*improved regional supply and demand dynamics*, and while
competitive pressures in the market impacting local price persist, *lower*
*interest rates are expected to drive improved demand and local price.*
*Market conditions impacting sales of coatings are expected to*
*improve compared with recent years* based on lower interest rates and
an increase in residential spending.

75.     On February 28, 2025, Dow filed a proxy statement on Form DEF 14A

with the SEC (the "2025 Proxy"), soliciting shareholder approval for, *inter alia*, the

election of Defendants Allen, Banister, Bush, Davis, DeVard, Dial, Fettig, Fitterling,

Hinman, Liebert, Moreno, Wyant, and Yohannes and the compensation of certain of

the Company's executive officers, including Defendants Fitterling and Tate.

76.     With respect to the Company's purported ability to navigate difficult

macroeconomic conditions, the 2025 Proxy stated that, "[i]n the face persistent

macroeconomic challenges, Dow continued to operate with discipline while making

strategic growth investments that position the Company to capture additional upside

as market conditions improve."

77.     With respect to the Company's internal controls, the 2025 Proxy stated

that the Audit Committee "[p]rovides oversight on the external reporting process and

the adequacy of the Company's internal controls" and [r]eviews the internal control

framework."

78.     With respect to the Company's risk management function, the 2025

Proxy stated:

The Board is responsible for overseeing overall risk management for the Company, including review and approval of the enterprise risk management approach and process implemented by management to identify, assess, manage and mitigate risk, at least annually. Each Committee is responsible for oversight of specific risk areas relevant to their respective Charters. Risk management is considered a strategic priority within the Company, and responsibility for managing risk rests with management while the Committees and the Board as a whole provide oversight. The Company has processes in place to identify, assess and monitor risks, which are part of the company's overall risk management process and have been embedded in the Company's operating procedures, internal controls and information systems.

**Enterprise Risk Management Approach and Process**

The enterprise risk management approach and process is conducted by Dow's strategic planning and business analysis function. This function is structurally independent of business lines. This function is led by the Senior Vice President of Corporate Development, who is responsible for risk management identification, assessment, and monitoring of risk management performance on an operational level. This role reports to the CEO. The enterprise risk management approach and process identifies, assesses, manages and mitigates risks. Risks are assessed on an annual basis using a broad range of inputs, both internal and external to Dow, including, but not limited to, strategic alignment; interrelation of risks; macroeconomic, industry, sustainability, geopolitical and regulatory trends; operations and safety; financial performance, including investor and rating agency perspectives; regulatory and compliance actions; market dynamics; and top risks highlighted by sources such as the World Economic Forum, The Conference Board, and industry consultants. Risks are then reviewed and categorized based on prioritization and risk tolerance, considering the potential impact and likelihood of a significant event occurring within the next five years. The results are reviewed by a varied, cross-functional leadership team representing each of Dow's businesses, functions and geographic regions. Each risk is assigned to a member of the leadership team and, if needed, internal subject matter experts accountable for a mitigation plan. Key risks that have specified mitigation actions are reviewed more regularly in leadership team meetings. Key risks,

including short and intermediate term risks, and emerging risks are also regularly evaluated at meetings of the Committees and Board, including risks with economic, environmental and social impacts. In addition, the Board believes that having an Independent Lead Director enhances the Board's independent oversight of the Company's risk mitigation efforts by enabling consultation between the Chair and Independent Lead Director on time-sensitive or urgent risks. Principal risks which may negatively impact the future results of the Company are reviewed at least quarterly and a detailed discussion is included in the section titled "Risk Factors" in the Company's Annual Report on Form 10-K and subsequent Quarterly Reports on Form 10-Q.

79.    On April 24, 2025, the Company issued a press release reporting its first quarter 2025 financial results (the "1Q25 Press Release"), which quoted Defendant Fitterling as stating, in pertinent part:

> We remain focused on disciplined execution and increased actions to improve profitability and support cash flow . . . . ***Despite ongoing macroeconomic challenges, Team Dow delivered a sixth consecutive quarter of [Y/Y] volume growth while taking actions to reduce costs and right-size capacity . . . . Today's announcements build on Dow's cost actions that are already underway, aiming to further strengthen our financial flexibility and support a balanced capital allocation approach***.

80.    The same day, the Individual Defendants hosted an earnings call to discuss the Company's first quarter 2025 financial results. During introductory remarks, Defendant Fitterling overstated the Company's ability to weather "volatile macroeconomic conditions":

> ***[I]n the face of volatile macroeconomic conditions, team Dow focused on operational discipline while taking actions to reduce costs and align capacity to the slower GDP conditions that are impacting our industry. We delivered our sixth consecutive quarter of [Y/Y] volume growth*** . . . . Sequentially, net sales were flat. This reflected lower

pricing in industrial intermediates and infrastructure and performance materials and coatings, *which was offset by downstream growth in silicones as a result of improvements in home and personal care and electronic end markets, as well as seasonally higher demand in building and construction and DIC*.

\*     \*     \*

As our industry weathers the current challenging conditions, we're executing several proactive and decisive actions to improve margins support near-term cash flow, and optimize our global portfolio. We're doing so today in a manner that is consistent with our best owner mindset and a balanced capital allocation approach. *Our purpose-built asset footprint and our low-cost feedstock positions primarily in The Americas and The Middle East, create a meaningful cost advantage for Dow and provide industry-leading flexibility to navigate global trade dynamics*. We're focused on improving our margins by reducing our spending and matching regional supply to profitable demand. As we've outlined throughout today's call, we have line of sight to $6 billion in near-term cash flow improvement.

\*     \*     \*

The Dow team is closely monitoring the current uncertain macro environment and *we're taking the necessary actions to further improve our competitive position* including looking for additional ways to reduce costs, and increase our competitiveness. Our near-term strategic priorities are focused on navigating the challenges our industry is facing. *By delaying the Alberta project, maintaining financial flexibility, protecting our balance sheet, rationalizing assets in high-cost regions, reducing costs, and focusing on profitable growth, we are positioning Dow for long-term success through the cycle.*

81.    Also during the 1Q25 Earnings Call, Defendant Carter stated, in

pertinent part:

We are moving with urgency to deliver strong operational and financial results through this persistent down cycle. *We are taking a hard look at everything across the enterprise with a sharp focus on driving*

32

*volume growth, capturing price, and taking actions in the near term that will enhance profitability and improve margins.* We will continue to accelerate our cost savings actions and are looking for additional opportunities to build on what we are already delivering.

*      *      *

*In addition to the comprehensive set of actions underway, we are adjusting our business to current market realities by leveraging our strategic asset footprint global reach, low-cost position, and unmatched feedstock flexibility. More specifically, we have a leading or low-cost position and world-class manufacturing sites in every geography, with well-developed, agile regional supply chain. And a deep understanding of the needs of our customers*. And are the only company with integrated polyethylene production on four continents. In addition, *Dow's unique feedstock flexibility allows us to optimize our assets based on regional advantages. We have the ability to crack the most optimal fee slate. And have the widest range to take advantage of dynamic periods.*

*This ability to capitalize on preferred feedstocks, paired with our breadth of process technologies, enables Dow to optimize what, where, and how we produce our products* to best serve our customers. And while the tariff environment remains fluid, we estimate greater than 95% of our North American volume is USMCA [United States–Mexico–Canada Agreement] compliant *which is an advantage for Dow . . . . [W]e have engaged in rigorous scenario planning to identify potential additional cost pressures and mitigation strategies. Altogether, our unmatched cost position and feedstock flexibility superior product mix, and geographic diversity are strong differentiators that give Dow a competitive edge today and throughout the cycle.*

82.    Defendant Tate similarly stated that, despite "global demand remain[ing] well below historical average GDP levels" and "[r]ecent disruption from tariffs," the Company still "expect[ed] demand to be positive for the year." Defendant Tate further stated that "Dow's global footprint with low-cost assets in

33

all regions should position us well to navigate current market dynamics," adding that "[s]hould we gain insights into substantial changes during the quarter, we're committed to maintaining transparency, and we'll provide timely updates accordingly."

83.    Defendant Tate further stated that "Dow's commitment to financial discipline" and "proactive actions we're taking to effectively manage this extended down cycle" which were "expect[ed] . . . to provide approximately $6 billion in near-term cash support" enabled "important flexibility in the midst of this low-growth environment, and increased macroeconomic and geopolitical uncertainty." Defendant Tate additionally stated:

> Our collective actions to navigate the realities of the current macroeconomic environment and deliver $6 billion in cash support over the next two years, enable Dow to maintain our financial flexibility. Our balance sheet remains solid, with no substantive debt maturities due until 2027.
>
> *            *            *
>
> We will continue to seek options where Dow can proactively take action to improve our capital structure *through this type of activity or derisking as we've done in the past*. We remain focused on delivering on our balanced capital allocation approach over the cycle.

84.    During the 1Q25 Earnings Call, Defendant Fitterling continued to overstate the Company's ability to navigate deteriorating macroeconomic conditions:

> We have an advantage in that we have footprint Canada, US, Argentina, Middle East. *We have the ability to flex the supply chain and to*

*mitigate tariff impacts on where we export our materials.*

*So it's very positive*. We also have the advantage that greater than 95% of everything we move between The United States and Canada is USMCA compliant. *So I think those things will have a positive impact.* But we just need a little bit better clarity on where these tariffs land and what that impact is on overall demand.

*        *        *

*[We h]ave a very active tariff and trade team that is engaged on all sides of that.* And, of course, a lot comes down to what's gonna be on an exemption list, and what isn't gonna be on an exemption list. *So we're optimistic that some discussions will start, and we'll get some clarity around that as the quarter develops. In the meantime, we're doing things that we need to do to flex that supply chain.*

85.    Similarly, Defendant Carter stated, in pertinent part:

*[W]e are well on our way on reconfiguring our supply chain*. The team has been working since really, you know, the middle of the first quarter. On this. *And so we are able to export quite a bit more product out of Canada. And then, of course, in The United States, our low-cost position enables us to produce for the local demand*. As a matter of fact, the growth project that [Defendant Fitterling] alluded to, Poly seven, that's going to start up in the second quarter is going to provide us even more flexibility to supply even more of that U.S. demand right here. And then, of course, we've got, you know, four on four continents sprayed a polyethylene production. So think about The Middle East as well. *As an opportunity for us to supply demand around the world but also direct in China.*

*So we are well positioned. We feel good about where we are. And able to mitigate the tariffs directly.*

*        *        *

[In] our industrial solutions business . . . , *although we are seeing softening demand, we are seeing awful pockets of stability*. Markets like energy, home care, and pharma end markets. *Data centers, an*

35

*example, is a significant growth opportunity for us*, and our solutions there are used in things like thermal management. I do just, though, just wanna double down the new asset that we're gonna start up there here in the second quarter. In The U.S. For new alkoxylation capacity. That unit is going to focus on growth and attractive end markets for us. So home and personal care and pharma. And, really, the good news around that asset is about 50% of that capacity is already contracted for. *We expect that to provide us with a tailwind going into the second half.*

86.     The statements identified above were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because the Individual Defendants downplayed the significance of deteriorating macroeconomic conditions, including reduced industry-wide demand and tariff-related uncertainty, and overstated the Company's ability to navigate such conditions. The Individual Defendants consistently highlighted factors that were unique to the Company, including its "differentiated portfolio" and "cost-advantaged footprint," which purportedly enabled the Company to navigate the headwinds, sustain its growth, and deliver on its capital allocation priorities, including its "industry-leading dividend." Further, despite descriptions of the Board's and the Audit Committee's oversight responsibilities with respect to the Company's internal controls and risk management function, the Board and the Audit Committee were failing to adequately fulfill these responsibilities and were causing and/or permitting the Company to issue the false and misleading statements detailed herein.

*The Truth Emerges*

87.     On June 23, 2025, BMO issued a report on the Company, reducing its

price target for Dow stock from $29.00 per share to $22.00 per share and stating, in pertinent part:

> The significant weakness across [Dow's] end-markets resulting in soft pricing and lower vol[ume]s/op[erating] rates is likely to result in severely challenged [second quarter] EBITDA and [second-half-of2025] estimates coming solidly lower. Looking at 2026, barring a change in the macro (or significant supply closures), we believe DOW's 2026 EBITDA is set to come in ~$1b[illio]n below consensus. Finally, with no end in sight for these anemic earnings levels, there appears a heightened risk DOW may cut the dividend.

88.     On this news, the price of Dow stock declined 3.21%, from a close of $27.76 per share on June 20, 2025 to a close of $26.87 per share on June 23, 2025, the following trading day.

89.     Then, on July 24, 2025, the Company issued a press release, reporting its second quarter 2025 financial results (the "2Q25 Press Release"), which revealed non-GAAP loss per share of $0.42, compared to analyst expectations of a $0.17 to $0.18 per share loss. The Company further reported $10.1 billion in net sales, a 7.3% decline year-over-year, missing consensus estimates by $130 million, "reflecting declines in all operating segments." Dow additionally reported that "[s]equentially, net sales were down 3%, as seasonally higher demand in Performance Materials & Coatings was more than offset by declines across the other operating segments."

90.     The 2Q25 Press Release quoted Defendant Fitterling as attributing the disappointing results to "the lower-for-longer earnings environment that our industry is facing, amplified by recent trade and tariff uncertainties" and announcing that

"[w]e are . . . adjusting our dividend to ensure we maintain a balanced capital allocation framework" and to "provide additional financial flexibility to help guarantee we maximize shareholder value, both in the current environment and as the industry recovers." Defendant Fitterling revealed that the Company's struggles would likely continue, citing "signs of oversupply from newer market entrants who are exporting to various regions at anti-competitive economics" and the need for "broader industry engagement and additional regulatory action to restore competitive dynamics."

91.     The Company issued another press release on the same day, announcing that it was reducing its dividend from $0.70 per share to $0.35 per share, citing a need for "financial flexibility amidst a persistently challenging macroeconomic environment."

92.     On this news, the price of Dow stock declined 17.45%, from a close of $30.37 per share on July 23, 2025 to a close of $25.07 per share on July 24, 2025.

## DAMAGE TO DOW

93.     As a direct and proximate result of the misconduct detailed above, the Company has incurred and will continue to incur significant financial losses, including but not limited to, the costs of defending against and incurring potential class-wide liability in the Securities Class Action.

94.    These damages also include the costs of remediating deficiencies in the Company's procedures and controls and compensation and benefits paid to current and former members of the Board and Company executives, who breached their fiduciary duties to Dow.

95.    Furthermore, as a direct and proximate result of the misconduct detailed herein, Dow has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's misrepresentations and management's breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

96.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breach of fiduciary duties by the Individual Defendants.

97.    Dow is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

98.    Plaintiff is a current shareholder of Dow and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

99.    A pre-suit demand on the Board of Dow is futile and, therefore, excused. At the time this action was commenced, the thirteen-member Board was comprised of Defendants Fitterling, Davis, Allen, Banister, Bush, DeVard, Dial, Fettig, Hinman, Liebert, Moreno, Wyant, and Yohannes (the "Director Defendants"). Accordingly, Plaintiff is only required to show that seven directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all of the Board's current members are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

100.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

101.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

102.    Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

103.    Defendant Fitterling is not disinterested or independent and is therefore incapable of considering a demand. Defendant Fitterling has served as the Company's CEO since 2018. Accordingly, the Company admits that Defendant Fitterling has a relationship that would materially interfere with his independent judgment and is not independent pursuant to the standards set forth by the NYSE. Further, Defendant Fitterling is named as a defendant and faces significant personal liability, in the Securities Class Action based on substantially the same wrongdoing as alleged herein, specifically issuing materially false and misleading statements during the Relevant Period.

104.    Defendants Bush, Davis, DeVard, Dial, and Yohannes served on the Company's Audit Committee during the Relevant Period (the "Audit Defendants") and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial accounting and reporting, the underlying internal controls and procedures over financial reporting, and the audits of the financial statements. At all relevant times, however, the Audit Defendants breached their fiduciary duty to the

41

Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business and the adequacy of its internal controls as alleged above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

105.   The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Directors to also adhere to the Company's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

106.   All of the Board's current members derive substantial revenue from the Company, control the Company, and are indebted to each other. These conflicts of interest have precluded the Board's current members from calling into question the

42

Director Defendants' conduct. Significantly, none of the Board's current members have taken remedial action to redress the conduct alleged herein.

107.  The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

108.  The acts complained of herein constitute violations of fiduciary duties owed by Dow's officers and directors, and these acts are incapable of ratification.

109.  The Individual Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Dow. If there is a directors' and officers' liability insurance policy covering the Individual Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Individual

43

Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain officers of Dow, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

110.    If there is no directors' and officers' liability insurance, then the directors will not cause Dow to sue the Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

111.    Thus, for all of the reasons set forth above, all of Dow's current directors are unable to consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## COUNT I

### Against the Individual Defendants for Violations of § 14(a) of the Exchange Act and Rule 14a-9

112.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

113.   The Individual Defendants violated § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

114.   The Individual Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in 2025 Proxy. As alleged above, the 2025 Proxy contained materially false and misleading statements concerning the Company's business prospects and its internal controls and risk management function.

115.   The 2025 Proxy was used to solicit shareholder votes in connection with the election of Defendants Allen, Banister, Bush, Davis, DeVard, Dial, Fettig, Fitterling, Hinman, Liebert, Moreno, Wyant, and Yohannes to serve for a one-year term on the Company's Board. In addition, the 2025 Proxy was used to solicit the advisory vote to approve the compensation of, *inter alia*, Defendants Fitterling and Tate. While the shareholder vote was non-binding, the 2025 Proxy indicated that "the Board and the Compensation and Leadership Development Committee will review and carefully consider the voting results when evaluating the executive compensation programs."

116.   Describing the Company's executive compensation program, the 2025 Proxy indicated that compensation is performance-based, stating that "Dow's pay

for performance programs and offerings . . . are designed to be equitable and fair, and to incentivize performance."

117.   The materially false and misleading statements contained in the 2025 Proxy regarding the Company's business prospects and its internal controls and risk management function therefore misleadingly induced shareholders to vote in favor of the election of Defendants Allen, Banister, Bush, Davis, DeVard, Dial, Fettig, Fitterling, Hinman, Liebert, Moreno, Wyant, and Yohannes and performance-based compensation to Defendants Fitterling and Tate, to which they were not entitled.

118.   The payment of unwarranted performance-based compensation to these Company executives was a waste of corporate assets.

## COUNT II

**Against Defendants Fitterling, Tate, and Carter for Contribution Under Section 10(b) and 21D of the Securities Exchange Act of 1934**

119.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

120.   Dow, along with Defendants Fitterling, Tate, and Carter (the "Officer Defendants"), are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.

121.   The Securities Class Action alleges that the class members relied, directly or indirectly, upon the false and misleading statements and omissions, as

alleged herein, in purchasing Dow securities. The Securities Class Action further alleges that, as a direct and proximate result, the class members suffered damages because the value of their investments were artificially inflated by the false and misleading statements and omissions, they purchased such securities at the artificially inflated prices, and the value of their investments fell when the truth was eventually revealed, causing economic losses to the class members.

122.    If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to the Officer Defendants' willful and/or reckless violations of their obligations as officers and/or directors of the Company.

123.    The Officer Defendants are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

124.    As such, the Company is entitled to receive all appropriate contribution or indemnification from the Officer Defendants.

## **COUNT III**

### **Against the Individual Defendants**
### **For Breach of Fiduciary Duties**

125.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

47

126.    The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

127.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

128.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

129.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes,

among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

130. Plaintiff, on behalf of Dow, has no adequate remedy at law.

## COUNT IV

**Against the Individual Defendants**
**For Aiding and Abetting Breach of Fiduciary Duty**

131. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

132. By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breach of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

133. Plaintiff, on behalf of Dow, has no adequate remedy at law.

## COUNT V

### Against the Individual Defendants
### For Unjust Enrichment

134.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

135.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material information, the fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of Dow.

136.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Dow that were tied to the performance or artificially inflated valuation of Dow, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

137.    Plaintiff, as a shareholder and representative of Dow, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

138.    Plaintiff, on behalf of Dow, has no adequate remedy at law.

## COUNT VI

### Waste of Corporate Assets
### Against the Individual Defendants

139.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

140.   As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Dow to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, and to lose assets from investors and customers who no longer trust the Company.

141.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

142.   Plaintiff, on behalf of Dow, has no adequate remedy at law.

### PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

a)      Declaring that the Plaintiff may maintain this action on behalf of Dow and that Plaintiff is an adequate representative of the Company;

b)      Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Dow;

c)      Determining and awarding to Dow the damages sustained, or disgorgement or restitution, by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

d)      Directing Dow to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Dow and its shareholders from a repeat of the damaging events described herein, including, but not limited to:

- strengthening the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- strengthening the Company's internal reporting and financial disclosure controls;

- developing and implementing procedures for greater stockholder input into the policies and guidelines of the Board; and

- strengthening the Company's internal operational control functions.

e)      Awarding punitive damages;

f)      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

g)      Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: September 11, 2025

**RIGRODSKY LAW, P.A.**

By: */s/ Timothy J. MacFall*
Timothy J. MacFall
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Telephone: (516) 683-3516
Facsimile: (302) 654-7530
Email: tjm@rl-legal.com

**GRABAR LAW OFFICE**
Joshua H. Grabar
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (267) 507-6085
Email: jgrabar@grabarlaw.com

Samir Aougab
1007 North Orange Street, Suite 453
Wilmington, DE 19801
Telephone: (302) 295-5310
Facsimile: (302) 654-7530
Email: sa@rl-legal.com

*Attorneys for Plaintiff*